**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | | |
|---|---|---|
| KEVIN POLLARD | : | Case No. 1:09-cv-873 |
| | : | |
| Plaintiff, | : | Judge Susan J. Dlott |
| | : | |
| v. | : | |
| | : | |
| ALSCO, INC. | : | |
| | : | |
| Defendant. | : | |

---

**PLAINTIFF'S MEMORANDUM IN OPPOSITION**
**TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**ORAL ARGUMENT REQUESTED**

---

Kelly Mulloy Myers (0065698)
Jon B. Allison (0073955)
Trial Attorneys for Plaintiff
FREKING & BETZ, LLC
525 Vine Street, Sixth Floor
Cincinnati, OH  45202
Phone:  (513) 721-1975/Fax:  (513) 651-2570
*kmyers@frekingandbetz.com*
*jallison@frekingandbetz.com*

I.      **INTRODUCTION**

Plaintiff Kevin Pollard ("Pollard") sued his former employer Alsco, Inc. ("Alsco") alleging violation of the Family and Medical Leave Act ("FMLA"), age discrimination, disability discrimination, retaliation for complaining of age and disability discrimination, and promissory estoppel.  Alsco moved for summary judgment on all claims.

Pollard became employed with Alsco in December 2006 as a Route Helper/Skipper. Skippers filled in for absent permanent route drivers and provided support on large deliveries. Pollard was promised the next available permanent route.  A year into Pollard's employment, a permanent route opened up following the departure of a permanent route driver in late 2007.

Pollard notified Alsco of his need to take FMLA protected leave for surgery on his colon and recovery from the surgery.  Alsco hired a significantly younger driver, Kevin McCracken, and Pollard trained McCracken on the new route with the understanding that, upon his return from leave, Pollard would take over the route.  Pollard took FMLA protected leave from January to March 2008.  During that time, Alsco hired another significantly younger driver, Ben Bolt.

When Pollard returned from leave, he was told that the route was given to McCracken and that the reason Pollard did not get the route was because he had taken the FMLA leave. Pollard complained to no avail.  Pollard was told at that point that he would get the next permanent route which was already being planned.  But in August 2008, that route was given to Ben Bolt.  Bolt was approximately twenty-five years younger than Pollard, had very little experience, especially compared to Pollard, and had wrecked one of Alsco's vehicles causing substantial damage.  Pollard was shocked.  He again complained and was simply told it was better for the company to give the route to Bolt.  When he pressed, he was told that there had allegedly been customer complaints about him.  That turned out not to be true.

A month later, just six months after his return from leave, and just one month after his most recent complaint regarding permanent route assignments, Alsco terminated Pollard based on the alleged misuse of his company fuel credit card and two cash deposits that came up missing. Pollard knew that another driver, Dave Dobbs, was responsible for both the misuse of the fuel card and the cash deposits, and he told his superiors not only that Dobbs was responsible, but also that he (Pollard) could prove it. Alsco deliberately ignored Pollard's protests, refused to investigate, and took the opportunity to terminate him. Shortly thereafter, when the significantly younger Dobbs' thefts continued, Alsco was forced to discipline Dobbs. Alsco let him resign.

## II.  FACTS

### A.  Pollard's Employment With Alsco.

Pollard, born in 1960, began working for Alsco at its Cincinnati location in December 2006 as a Route Helper/Skipper. (Chilton Dep. at 19; Pollard Dep. at 6, 16, 46-49, 54; Dobbins Dep. at 13, 15.) Skippers filled in for absent permanent route drivers and provided support on large deliveries. (Pollard Dep. at 49-50.)

Pollard reported directly to Adam Chilton, Manager of Alsco's Cincinnati location. (Chilton Dep. at 6-8, 11; Pollard Dep. at 63-64; Pinnick Dep. at 12-13; Dobbins Dep. at 12.) Chilton directly reported to James Wilder, Service Manager in Indianapolis. (Chilton Dep. at 10-11; Wilder Dep. at 7.) Wilder in turn reported directly to Wes Dobbins, General Manager of the Indianapolis facility. (Chilton Dep. at 11; Dobbins Dep. at 11.) Mike Pinnick was the Office Manager working in Indianapolis and performed human resources duties in that position. (Pinnick Dep. at 5-10; Chilton Dep. at 10, 11.) Reggie Reich was a Regional Human Resources Manager for Indianapolis and Cincinnati. (Reich Dep. at 5.)

2

Alsco's Cincinnati location ran three full permanent routes: Cincinnati, Columbus and Dayton; and a partial route to Lexington. (Chilton Dep. at 40-41.)  When Pollard substituted for a Driver, he delivered orders, accepted orders for the following week, and picked up dirty linens. (Pollard Dep. at 50.)  When he provided support, Pollard normally drove the company van. (Pollard Dep. at 127.)  Each Driver took turns being on call on the weekends and a day or two during the week.  (Pollard Dep. at 131.)  On these on-call days, the Driver would bring the van home.  (Pollard Dep. at 131.)

Drivers were allowed to accept cash payment from customers.  (Chilton Dep. at 71-72; Reich Dep. at 74-75.)  They completed a deposit slip and settlement sheet when they received this cash.  (Pollard Dep. at 164; Chilton Dep. at 70-71.)  Drivers totaled the prepaid income and cash income at the end of the day on the settlement sheet.  (Pollard Dep. at 166-167; Chilton Dep. at 75-76.)  A Driver put their cash, deposit slip and settlement sheet in an interoffice company bag which is kept at the branch and then taken to Indianapolis.  (Chilton Dep. at 73-76; Pollard Dep. at 167.)  The deposit bags were locked with keys but a Driver could open another's deposit bag if he had the keys.  (Chilton Dep. at 74; Pollard Dep. at 172.)  From time to time, cash deposits would come up missing.  When that happened, Drivers' paychecks were reduced. (Pollard Dep. at 181; Pinnick Dep. at 73.)

Drivers used a company gas card with a PIN to fill up company vehicles.  (Pollard Dep. at 128-129.)  Driver's PINs changed from time to time, but during the relevant time period it was the last four numbers of the Driver's Social Security number.  (Pollard Dep. at 129.)  Pollard did not give his PIN to other Drivers, but Chilton left Pollard's PIN sitting on his desk which was right next to Dobbs' desk.  (Pollard Dep. at 130, 138.)  A company credit card was kept in each vehicle.  (Pollard Dep. at 127-128.)

**B.**     **Dobbins Promised Pollard A Permanent Route.**

3

Dobbins was very impressed with Pollard at his interview and continued to think highly of him after Pollard began working. (Dobbins Dep. at 16, 19, 20, 25.) At Pollard's interview, Dobbins told Pollard that, based on seniority and upon good performance, he would automatically get the next available permanent route. (Pollard Dep. at 53; Dobbins Dep. at 56-57; Wilder Dep. at 20.) Dobbins also told Pollard that Alsco would raise his starting salary in a couple of months assuming good performance. (Pollard Dep. at 55; Dobbins Dep. Ex. 1; Dobbins Dep. at 23-24.) Pinnick and Dobbins reviewed Pollard's performance in approximately June 2007; it went very well and resulted in a retroactive merit increase. (Pollard Dep. at 62-63.) Dobbins and Pinnick told Pollard they had been hearing very good things about him and they were happy with his performance. (Pollard Dep. at 62.)

### C. Chilton Made Ageist Comments.

Chilton repeatedly made comments to Pollard, who was the oldest Driver in Cincinnati, like "old man get out of my way, you're too slow," or "old man, you're slower than sh_t." (Pollard Dep. at 185-186.) Dobbs made similar comments which Chilton heard. (Chilton Dep. at 47-49.) Moreover, Dobbs repeatedly criticized Pollard's work, telling him, without foundation, that customers were complaining about him. (Pollard Dep. at 71-73, 76.) Pollard told Chilton about Dobbs' fabricated complaints. (Pollard Dep. at 74.) In fact, as Pollard explained to Chilton, the subject of many complaints from Dobbs' customers were in Dobbs' control, not his. (Pollard Dep. at 74-77.)

### D. Pollard Took FMLA Leave.

In January 2008, Pollard took two months of FMLA leave for his own serious health condition - surgery on his colon and recovery from the surgery. (Pollard Dep. at 81-84, 88, 97; Chilton Dep. at 32; Pinnick Dep. at 18; Dobbins Dep. at 30-31.) Pollard told Chilton about his

need for leave about one month prior to its start and Alsco certified Pollard's two-month absence as FMLA leave. (Pinnick Dep. at 34-35; Pollard Dep. at 86-87, 98; Chilton Dep. at 32.)

Shortly before the start of Pollard's FMLA leave, the Driver who had the Columbus route departed and Kevin McCracken, born 1970, was hired. (Personnel Doc. attached as Pl. Ex. A; Pollard Dep. at 91-92.) Chilton directed Pollard to train McCracken on the Columbus route. (Pollard Dep. at 93-94, 101-102; Chilton Dep. at 34.) Because he had been promised it, and because his performance warranted it, Pollard understood that he would get the Columbus route upon his return from leave and that he was only training McCracken to fill in for him while he was on leave. (Pollard Dep. at 95-96, 99.)

### E. Pollard Was Told He Did Not Get A Route Because He Took FMLA Leave And He Complained Of Discrimination And Retaliation.

Pollard trained McCracken as directed before he started his FMLA leave. (Pollard Dep. at 96-97.) When Pollard returned, Chilton told him McCracken was going to stay on the route and he (Pollard) did not get the route because he took FMLA leave. (Pollard Dep. at 98, 102; Chilton Dep. at 34-36.) Pollard complained to Chilton and to Dobbins about the fact that he was being passed over in favor of a significantly younger driver after being out on FMLA leave. (Pollard Dep. at 103-104.) Pollard believed he was being passed over because he took leave, because of his age, and because he was perceived as disabled following his return, perhaps due to being on light duty for a period of time following the leave. (Pollard Dep. at 108, 178-179, 182, 185.) Dobbins told Pollard that he appreciated his understanding about the way "circumstances unfolded," and promised him Alsco would take care of him. (Pollard Dep. at 104.)

Alsco started planning a new permanent route called the I-275 loop route and put it in place in approximately August 2008. (Pollard Dep. at 110-111; Chilton Dep. at 41.) Incredibly,

Alsco gave the route to Ben Bolt, born 1984, who had been hired while Pollard was out on leave. (Pers. Doc. attached as Pl. Ex. B; Pollard Dep. at 105, 111; Chilton Dep. at 35-36, 38, 41.)[1] Bolt was twenty-five years younger than Pollard, had far less experience, had been employed with Alsco for just seven months, and had already managed to wreck an Alsco vehicle, causing substantial damage and cost. (Pl. Ex. B; Chilton Dep. at 60.) Yet he received the route.

Pollard was not told that he was not getting this route until just days before the route's inception. (Pollard Dep. at 111-112, 116.) Until that point, Pollard had been told by Chilton and Dobbins the route was his. (Pollard Dep. at 112-114.) When Pollard complained about the decision, Chilton only told him that he thought it would be better for the company. (Pollard Dep. at 116-117.) When Pollard pressed for further explanation, Chilton told him there were some complaints, including a minor complaint about him from a Dayton company in February. (Pollard Dep. at 117.) When Pollard reminded Chilton that he was on FMLA leave in February, Chilton got very vague about the complaints and did not respond to Pollard's question about whether there were complaints in writing. (Pollard Dep. at 118.)

### F. Dobbs Misused The Company Fuel Card And Took Cash Deposits, But Pollard Took The Blame.

On August 27, 2008, Pollard had the van at home because he was on call from the night of the 26th to the day of the 27th. (Pollard Dep. at 132.) At about 4:15 p.m. on August 26, Pollard got gas at a Speedway on Galbraith Road and entered mileage of 105,487. (Pollard Dep. at 134.) He put about 29 gallons of gas in the van. (Pollard Dep. at 134.)

That morning at about 5:30 a.m., Dobbs called Pollard to tell him to come in and cover Dobbs' route and instructed Pollard to meet him at the office. (Pollard Dep. at 137, 141, 143.)

---

[1]Citing only Pollard's testimony and ignoring testimony from its own witnesses, Alsco now claims that Bolt remained a Skipper. Pollard did not testify as such. Instead, he explained that Bolt was hired to do his duties while he was on leave and then very shortly before his termination was given the new I-275 route that had previously been promised to Pollard. (Pollard Dep. at 105, 111.)

6

Pollard arrived at work at 6:10 and got in Dobbs' box truck to run the route.  (Pollard Dep. at 137, 141.)  Dobbs got in the van.  (Pollard Dep. at 142.)  Dobbs told Pollard to get started on the route and that he would meet Pollard later on the route with the van.  (Pollard Dep. at 137-138.)  Pollard proceeded to run the route and Dobbs caught up with him approximately an hour later.  (Pollard Dep. at 144-145.)  They completed the route together.  During the hour of Dobbs' absence, he fueled up his own vehicle.

On September 2, 2008, Pollard completed a deposit slip and settlement sheet for his route and sent it to Indianapolis through the interoffice mail.  (Pollard Dep. at 168-169.)  He was told the following day that his bag did not show up in Indianapolis.  (Pollard Dep. at 169.)  Pollard protested that he sent the bag.  (Pollard Dep. at 169-170.)  On September 4, 2008, Pollard, who was on a regular run to Indianapolis, stopped in to see Carol Elder, Billing Specialist, about the missing deposit.  (Pollard Dep. at 170.)  Elder told him that the settlement sheet and deposit slip arrived, but that the bag did not.  (Pollard Dep. at 170-173.)  Elder showed Pollard the settlement sheets which had been erased.  (Pollard Dep. at 170-171; Pinnick Dep. at 58.)  Pollard told Elder Dobbs was responsible and she believed him.  (Elder Dep. 11-12.)  Pollard went straight to Pinnick to tell him that he believed Dobbs got to the deposits because he also appeared to be stealing gas by fueling up his personal vehicle.  (Pollard Dep. at 171.)  Pollard explained the basis for his suspicions to Pinnick and, at Pinnick's request, later sent some documentation to Pinnick.  (Pollard Dep. at 153-157; Pinnick Dep. at 66-70; Pinnick Dep. Ex. 1.)

### G.    Pollard Was Terminated.

On September 11, 2008, Chilton delivered to Pollard a number of written disciplines and terminated Pollard.  (Chilton Dep. at 81; Pollard Dep. at 15-16, 147-148, 160; Pinnick Dep. at 62.)  Pollard was accused of misuse of the company fuel card, two separate missing deposits, losing the fuel card on two separate occasions and putting the wrong type of fuel in the truck.

7

(Chilton Dep. Exs. 2, 3, 4; Chilton Dep. at 80.) Pollard had put the wrong fuel in the tank and had lost the fuel card one time. (Pollard Dep. at 148, 158-159.) But all of the other allegations were false, including the allegations for which he was terminated - misuse of the company fuel card and the missing deposits.

Pollard protested that he was not responsible, that Dobbs was responsible, and he could prove it. (Pollard Dep. at 148-151.) Pollard provided an explanation for the alleged misuse of the fuel card as well as the missing deposits. (Pollard Dep. at 148-151, 167-168.) Pollard also explained that he had addressed these issues already with Pinnick. (Pollard Dep. at 148-151.) Chilton ignored Pollard's explanations and told him they didn't matter. (Pollard Dep. at 148-151.)

Reich had given the instruction to investigate the matter and find out if Pollard had an explanation for the apparent misuse of the fuel card and the missing deposits. (Reich Dep. at 20-21, 23-24.) No one investigated, despite the fact that Pinnick had been told by Pollard that Dobbs was responsible for the misuse of the fuel card and the missing deposits, and despite the fact that he had relayed to Dobbins and Chilton that Pollard had given him this information, and despite the fact that Pollard told Chilton that Dobbs was responsible for the misuse of the fuel card and the missing deposits. (Pinnick Dep. at 44-45, 51-54; Dobbins Dep. at 63-64; Chilton Dep. at 74, 82-86; Wilder Dep. at 36-37.) Instead, Chilton relayed that Pollard had no explanation and took the opportunity to terminate him. (Pinnick Dep. at 44-45, 52-54; Dobbins Dep. at 63; Reich Dep. at 20, 23, 25, 50, 97.)

Dobbs, who was born in 1971, continued to steal from the company and was disciplined for it shortly after Pollard's termination. (Pers. Doc., attached as Pl. Ex. C.) He was permitted to resign. (Pl. Ex. C.)

III.    **ARGUMENT**

A.    **Pollard Can Establish His Claims Pursuant To The FMLA.**

The FMLA requires eligible employers to provide up to twelve weeks of leave per year to employees to care for a child, spouse, or parent with a "serious health condition" or for the employee's own serious health condition. 29 U.S.C. §2612(a). An employer is prohibited from discriminating against employees who have taken FMLA leave and may not use the taking of FMLA leave as a negative factor in terminating an employee. 29 C.F.R. §§ 825.220; *Skrjanc v. Greate Lakes Power Serv. Co.*, 272 F.3d 309, 314 (6th Cir. 2001).

To establish a *prima facie* retaliation claim, Pollard must show: 1) he availed himself of a protected right under the FMLA; 2) he was adversely affected by an employment decision; and 3) there was a causal connection between the adverse action and the leave. *See id*. Once Pollard has established these elements, Alsco must articulate a legitimate, non-discriminatory reason for Pollard's discharge under the *McDonnell Douglas* burden shifting analysis. *Skrjanc*, 272 F.3d at 315-316. In *EEOC v. Avery Dennison Co.*, 104 F.3d 858, 861, (6th Cir. 1997), the Sixth Circuit held that the burden of establishing a *prima facie* case of retaliation is easily met. Alsco does not dispute the first two prongs of the *prima facie* case and its claim that Pollard cannot demonstrate a causal connection is without merit.

The Sixth Circuit in *Singfield v. Akron Metropolitan Housing Authority*, 389 F.3d 555, 563 (2004) cited with approval other courts that have held "[c]ausation sufficient to establish a *prima facie* case of unlawful retaliation may be inferred from the proximity in time between the protected action and the allegedly retaliatory discharge. *Citing Miller v. Fairchild Indus., Inc.*, 797 F.2d 727, 731 (9th Cir. 1986). The plaintiff in *Singfield* was terminated after he was accused of making statements to other employees that he was planning to kill his supervisor. The *Singfield* Court noted that the plaintiff had submitted evidence that he was terminated just three

9

months after he filed a discrimination charge. The Sixth Circuit agreed with the plaintiff's argument and concluded "that the temporal proximity of these events is significant enough to constitute sufficient evidence of a causal connection for the purpose of satisfying Singfield's burden of demonstrating a *prima face* case." *Id*. at 563. *See also DiCarlo v. Potter, Postmaster General*, 385 F.3d 408, 421 (6th Cir. 2004) (citing cases where a time lag of six months has been sufficient, even without further evidence, to make out a *prima facie* case of retaliation).

Here, Pollard demonstrated that within six months of his FMLA leave, he was denied a promised promotion *twice* and then terminated. This by itself is sufficient to defeat summary judgment. Alsco's reliance on its claim that McCracken was hired for the Columbus route before Pollard started FMLA leave is without merit. (Def. MSJ at 5.) A jury could believe Pollard's testimony that Alsco knew that he needed leave about a month before he actually started and conclude that Alsco knew about the need for leave before hiring McCracken. A jury could also believe Pollard's testimony that Chilton told him McCracken got the Columbus route instead of him *because he was on FMLA leave*. Reich and Dobbins agreed this scenario presented a problem. (Reich Dep. at 60, 62, 100; Dobbins Dep. at 38-39, 42, 54.) A jury would not need to make any significant inferential leap to conclude that an employer who would refuse an employee a promotion would terminate that same employee as soon as it had the opportunity, especially when coupled with the evidence of pretext discussed below. *See e.g. Blair v. Henry Filter, Inc*. 505 F.3d 517, 525 n. 7 (6th Cir. 2007). Summary judgment on this basis is thus inappropriate.

### B. Pollard Can Establish A *Prima Facie* Case Of Age And Disability Discrimination.

Under the circumstantial or indirect evidence approach, Pollard can establish a *prima facie* case of age and disability discrimination by proving the following elements: (1) he was in a

protected class; (2) he was qualified for the job he held; (3) he suffered an adverse employment action; and (4) he was replaced by someone outside the protected class, he was treated differently than similarly situated employees outside the protected class, or that additional direct or circumstantial evidence exists that shows that the employer was motivated by Plaintiff's age/disability in making its decision.  *O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308 (1996); *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 253-54 (1981); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 350 (6th Cir. 1998); *Ohio Civil Rights Commission v. Ingram*, 69 Ohio St.3d 89, 92 (1994) (Ohio courts apply federal law on state discrimination claims).

Alsco completely ignores the evidence of more favorable treatment of similarly situated, significantly younger individuals.  McCracken and Bolt were both given the routes promised to Pollard.  The Bolt route is particularly alarming because he was twenty-five years younger than Pollard, had far less experience, had only been employed for seven months, and in that time had wrecked a vehicle.  Reich agreed this scenario presented a problem.  (Reich Dep. at 100.)  And while Pollard was terminated for his alleged misuse of the company fuel card, he provided an explanation that was ignored.  When the company did finally discipline Dobbs for the conduct for which Pollard was fired, the significantly younger Dobbs was allowed to resign.  This evidence, coupled with Chilton's comments about Pollard's age, allow a jury to determine that Pollard has satisfied the fourth prong of the *prima facie* discrimination claim.

Alsco's claim that Pollard cannot satisfy his disability discrimination claim is likewise without merit.  Pollard can demonstrate membership in the protected class by demonstrating a perceived disability.  42 U.S.C. §12102(2); O.R.C. § 4112.01(13).  A jury could agree with Pollard's testimony that his supervisors perceived him to be disabled and that he was treated less

favorably than the non-disabled Bolt, McCracken and Dobbs.  Summary judgment on his discrimination claims is therefore inappropriate.

**C.     Pollard Can Establish A *Prima Facie* Case Of Retaliation For Engaging In A Protected Activity.**

Retaliating against an employee because he opposed unlawful discrimination is expressly prohibited by the ADA and O.R.C. 4112.02(I).  The elements of a claim for retaliation are:  (1) that plaintiff engaged in protected activity; (2) that his exercise of civil rights was known to the defendant; (3) that he was the subject of adverse employment action; and (4) that a causal link existed between the protected activity and the adverse action.  *Wrenn v Gould*, 808 F.2d 493, 500 (6th Cir. 1987).  This burden of proof presents a "low hurdle" to Plaintiff.  *Gribcheck v. Runyon*, 245 F.3d 547, 551 (6th Cir. 2001) (retaliation claim under the Rehabilitation Act);  *EEOC v. Avery Dennison Corp.*, 104 F.3d 858, 861 (6th Cir. 1997).

Alsco offers no substantive argument disputing Pollard's claim that he was retaliated against for engaging in protected activity.  (Def. MSJ at 11-14.)  And a jury could easily conclude that Pollard satisfied the *prima facie* case.  Pollard testified that he complained multiple times about not receiving a permanent route in favor of significantly younger drivers who were not perceived to be disabled, the last time only about a month before his termination.  This evidence, coupled with the evidence of pretext discussed below, makes summary judgment on Pollard's claim of retaliation for engaging in protected activity inappropriate.

**D.     Pollard Can Establish That Defendant's Asserted Reasons For Terminating Him Had No Basis in Fact, And Were Not The Real Reason For Termination.**

Because Pollard established a *prima facie* case of discrimination and retaliation, Alsco must present some legitimate, nondiscriminatory reason for the termination.  *St. Mary's Honor Center v. Hicks*, 509 U.S. 502 (1993).  Once Alsco meets this burden of production, Pollard then

has the opportunity to show that its articulated reason for the termination is a pretext. *Id.* at 507.

In *Hicks*, the Court stated:

> The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination. Thus, rejection of the defendant's proffered reasons will *permit* the trier of fact to infer the ultimate fact of intentional discrimination, and the Court of Appeals was correct when it noted that, upon such rejection, [n]o additional proof of discrimination is required.

*Id.* at 511 (emphasis in original; footnote and citation omitted). Thus, the employee need not produce *additional* evidence of discrimination. As the Supreme Court clarified in *Reeves v. Sanderson Plumbing*, 530 U.S. 133, 149 (2000), a plaintiff's *prima facie* case combined with sufficient evidence to find that the employer's asserted justification lacks credibility will permit the trier of fact to infer that the employer was motivated by unlawful discrimination. In *Reeves*, the Supreme Court unanimously and authoritatively rejected the pretext-plus approach that several circuits had used previously in ruling on motions for summary judgment. *Id.* at 140-41. The Court held that the Fifth Circuit had "erred in proceeding from the premise that a plaintiff must always introduce additional, independent evidence of discrimination." *Id*. at 149.

To establish that Defendant's explanation for the termination is unworthy of belief, Pollard may show that it had no basis in fact or did not motivate the termination decision. *Manzer v. Diamond Shamrock Chemicals Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994). The Sixth Circuit has stressed that it is important to analyze all of the evidence of pretext together. *Thurman v. Yellow Freight Sys.*, 90 F.3d 1160, 1166-1167 (1996). As the Southern District of Ohio recently emphasized, the "Sixth Circuit has cautioned that courts should 'avoid formalism' in the application of this test, 'lest one lose the forest for the trees.' Pretext. . . 'is a common sense inquiry: did the employer fire the employee for the stated reason or not? This requires a court to ask whether the plaintiff has produced evidence that casts doubt on the employer's

explanation, and, if so, how strong it is.'  At base, then, the *Manzer* test can be distilled to one simple requirement here: Plaintiff must produce sufficient evidence such that a reasonable jury could doubt [Defendants'] stated reasons for its actions." *McCart v. University of Cincinnati Foundation,* 2010 U.S. Dist. LEXIS 34406, *1, *20-*21 (J. Spiegel), citing *Chen v. Dow Chem. Co.*, 580 F.3d 400, n. 4 (6th Cir. 2009).

The disciplinary memos Chilton issued to Pollard in the termination meeting claim a misuse of a company fuel card, missing deposits, the loss of company fuel cards, and an inadvertent use of the wrong gasoline causing damage to a vehicle.  Alsco claims at summary judgment that customer complaints about Pollard resulted in the decision to deny him a promotion. (Def. MSJ at 16-17.)  When an employer offers "multiple reasons for discharging a plaintiff, the plaintiff need only discredit one of the proffered reasons."  *Smith v. Good Samaritan Hospital*, Case No. 1:06cv207, 2007 U.S. Dist. LEXIS 48304, *19 (S.D. Ohio July 3, 2007, J. Barrett) citing *May v. Pilot Travel Centers, LLC*, Case No. 2:05-cv-918, 2007 U.S. Dist. LEXIS 484 (S.D. Ohio 2007); *Powell v. Rumsfeld,* 42 Fed. Appx. 856 (7th Cir. 2002); *Russell v. Acme-Evans Co.*, 51 F.3d 64, 70 (7th Cir. 1995); *Bryant v. Farmers Ins. Exchange*, 432 F.3d 1114, 1127 (10th Cir. 2005) (holding that discrediting one proffered reason, such as the dominant reason, can cast doubt on all remaining reasons, even if they have not been discredited.)  In this case, Pollard has presented a genuine issue as of fact to each of Defendant's articulated reasons.

### 1.    The Multiple Conflicting Explanations Of The Route Assignments And The Termination Decision Prohibit Summary Judgment.

A jury could consider the vastly different explanations of the route assignments and the decision to terminate Pollard and find pretext.

No one took responsibility for route assignments to McCracken and Bolt.  In his deposition, Chilton testified that he had no responsibility for assigning routes and instead said

Dobbins or Wilder would have made those decisions. (Chilton Dep. at 38, 50-51, 59-61.) Wilder, however, testified the decisions were made by Chilton. (Wilder Dep. at 13-14.) Dobbins likewise disclaimed any responsibility for assigning routes to Bolt or McCracken. (Dobbins Dep. at 46-47.) In fact, he claimed to not even know who Ben Bolt was. (Dobbins Dep. at 39-40.) Pinnick testified that assigning routes should have been Chilton's responsibility with Dobbins' approval and denied any responsibility for assigning routes. (Pinnick Dep. at 35, 39-40.)

In addition to the credibility issues raised by the fact that no defense witness took responsibility for the route assignments, there are also serious credibility issues with respect to why the decisions were made to give routes to McCracken and Bolt instead of Pollard. No one provided any explanation for the McCracken route assignment. With respect to the Bolt route assignment, Pollard testified he was told that there had been customer complaints about him, but no one could provide any details. (Pollard Dep. at 106, 116-118.) That is probably because there were none.

Dobbins denied in his deposition that any customer complaints prevented Pollard's promotion and could not explain why Bolt received a route over Pollard. (Dobbins Dep. at 53-54, 58.) In his deposition, Chilton could only vaguely recall one complaint about Pollard, but could recall no specifics about the complaint. (Chilton Dep. at 52-53, 57.) Chilton claimed he did not know whether customer complaints had anything to do with Pollard not getting a route and that he did not recall ever telling Pollard that he was not getting a route due to customer complaints. (Chilton Dep. at 55-59.) Nor did Chilton remember any conversation with Wilder or Dobbins about complaints about Pollard. (Chilton Dep. at 59.) Yet everyone else testified that everything they knew about any customer complaints regarding Pollard came from Chilton.

15

Pinnick claimed that Chilton told him about Pollard's desire for the 275 route, but that customer complaints prevented him from getting it. (Pinnick Dep. at 35.) Dobbins testified that Chilton told him that when he (Chilton) filled in for Pollard while he was out on leave, he learned of customer complaints about Pollard. (Dobbins Dep. at 51-52, 54-55.) Dobbins said he thought Wilder confirmed the complaints, but Wilder testified otherwise. (Dobbins Dep. at 101; Wilder Dep. at 16-17.) Wilder testified that Chilton told him of customer complaints about Pollard and that Chilton told him he decided not to give Pollard a permanent route due to poor performance. (Wilder Dep. at 15-18; Dobbins Dep. at 29.)

In the end, Pinnick, Dobbins and Wilder all acknowledged that everything they knew about Pollard's performance and any complaints about his performance came from Chilton. (Dobbins Dep. at 52; Wilder Dep. at 15-18, 22-24; Pinnick Dep. at 30.) There was one exception. Pinnick claimed to have seen a written complaint about Pollard and testified that it would be in his file. (Pinnick Dep. at 30, 36.) It isn't. Pollard himself could only recall one customer complaint. (Pollard Dep. at 78-80.) In any event, all of the defense witnesses had to admit that all of their Drivers receive customer complaints from time to time. (Pinnick Dep. at 40; Dobbins Dep. at 69-70; Wilder Dep. at 52.)

There are also serious credibility issues with regard to the decision to terminate Pollard. Pinnick testified it was Chilton's decision to terminate Pollard with input from Dobbins. (Pinnick Dep. at 46, 62-65.) Reich and Wilder both claimed that Chilton was responsible for making the recommendation; Wilder claimed that Dobbins was responsible for approving it; Reich claimed that she had approval responsibility. (Wilder Dep. at 32; Reich Dep. at 18-19.) Wilder denied any involvement in the termination decision. (Wilder Dep at 26.) Chilton, however, disclaimed any responsibility for the decision to terminate Pollard and pointed to Wilder and Dobbins as decision makers. (Chilton Dep. at 51, 55-56, 88-91.)

16

Pinnick and Dobbins testified that the alleged fuel theft was the reason for termination. (Pinnick Dep. at 54; Dobbins Dep. at 67-68.)  Chilton, however, testified he thought Dobbs was responsible for the fuel theft.  (Chilton Dep. at 63, 80-81, 88-91.)  And Chilton could not explain why Pollard was not confronted until September 12 for a deposit allegedly missing on June 30. (Chilton Dep. at 78.)  Pinnick admitted it would be unusual for a driver not to be informed that a deposit was missing.  (Pinnick Dep. at 73.)

> **2.     A Jury Could Believe That Pollard Did Not Misuse The Fuel Card Or Steal Deposits And Any So-Called Honest Belief That He Did Does Not Entitle Alsco To Judgment As A Matter of Law.**

As discussed fully *supra* in Section II.G, Pollard vehemently denied pocketing cash paid by customers in June and September.  (Pollard Dep. at 163-164.)  Pollard also denied that he used the company fuel card for his personal vehicle.  (Pollard Dep. at 136-137, 141.)  Pinnick admitted that it would be foolish for a Driver to record a deposit on a settlement sheet and then steal the money.  (Pinnick Dep. at 32, 55-56.)  Pinnick also admitted that it was odd that Pollard would have told him about fuel theft if Pollard had committed it.  (Pinnick Dep. at  48.)  Coupled with Pollard's testimony that he told multiple defense witnesses that Dobbs was responsible for the missing cash and the misuse of the fuel card, along with Dobbs' eventual discipline for fuel card misuse, a jury could easily believe Pollard's denials of misconduct.

Moreover, the absence of any investigation of the fuel theft and missing deposits, even after Pollard provided a reasonable explanation to multiple defense witnesses, prevents Alsco from relying on any so-called "honest belief" that Pollard committed these thefts.  Reich told Pinnick not to terminate Pollard if he had a reasonable explanation for the back to back fuel charges.  (Reich Dep. at 23-24.)  Pollard did provide an explanation to multiple defense witnesses, but they just ignored it.  (Pinnick Dep. at 44-45, 52-54; Dobbins Dep. at 63-64; Chilton Dep. at 85-86; Pollard Dep. at 174-175.)

17

Chilton admitted that Pollard blamed Dobbs.  (Chilton Dep. at 78, 84.)  Wilder testified that he, Pinnick and Dobbins spoke about Pollard's claim that Dobbs was at fault.  (Wilder Dep. at 36-37.)  Wilder further testified that Dobbs could have been at fault for the conduct for which Pollard was allegedly terminated.  (Wilder Dep. at 37.)  Despite this, Chilton reported that Pollard provided no explanation relative to the conduct for which he was allegedly terminated and Pinnick passed that misinformation up to Reich.  (Pinnick Dep. at 44-45, 52-54; Dobbins Dep. at 63; Reich Dep. at 20, 23, 25, 50, 97.)

A jury could conclude that nobody investigated because, like Chilton said, Pollard's explanations did not matter.  He wasn't really being terminated for the alleged misconduct, but for discriminatory and retaliatory reasons.  Because a jury could examine the reasons given for terminating Pollard's employment and find them either false outright, insufficient to justify termination, or the alleged investigation "so ridden with error that  . . . Defendant could not honestly have relied upon it," Pollard has established a genuine issue of fact regarding pretext. *In Re Lewis*, 845 F.2d 624, 633 (6th Cir. 1988).

### 3. The Remaining Disciplines Were Insufficient To Warrant Termination.

A jury could also dismiss the other disciplines issued to Pollard on September 11 as insufficient to motivate his termination.  The disciplinary documents themselves provide that Pollard was not terminated for putting the wrong fuel in a company vehicle or for losing the fuel card.  Also, while Pollard admitted to losing the fuel card one time, he denied losing it a second time.  (Pollard Dep. at 124-125; Chilton Dep. at 65-66.) The defense witnesses acknowledged that Drivers lost fuel cards and put the wrong fuel in company vehicles from time to time. (Dobbins Dep. at 68-69; Wilder Dep. at 25; Dobbins Dep. at 68-69.)  Finally, defense witnesses did not testify that Pollard was terminated for these incidents.

18

G.    **Pollard Has Established A Question of Fact Regarding His Promissory Estoppel Claim.**

Promissory estoppel has been defined as a promise which a promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance, and it is binding if injustice can be avoided only by enforcement of the promise. *Holt Company of Ohio v. Ohio Machinery Co.*, No. 06AP-911, 2007 Ohio 5557, 2007 Ohio App. LEXIS 4885, ¶26.  A claim of promissory estoppel involves four elements: (1) there must be a clear and unambiguous promise, (2) the party to whom the promise was made must rely on it, (3) the reliance is reasonable and foreseeable, and (4) the party relying on the promise must have been injured by the reliance. *Patrick v. Painesville Commercial Properties, Inc.*, 123 Ohio App.3d 575, 583 (1997).  Pollard has demonstrated that Alsco promised him an automatic promotion and that he reasonably relied on that promise to his detriment. See *supra* Section II.B. Summary judgment on this basis is therefore inappropriate.

IV.    **CONCLUSION**

For all of the foregoing reasons, Pollard respectfully requests that this Court deny Defendant's Motion for Summary Judgment with respect to all Counts.

Respectfully submitted,

/s/ Jon B. Allison (0073955)
Kelly Mulloy Myers (0065698)
Jon B. Allison (0073955)
Trial Attorneys for Plaintiff
FREKING & BETZ, LLC
525 Vine Street, Sixth Floor
Cincinnati, OH  45202
Phone:  (513) 721-1975/Fax:  (513) 651-2570
*kmyers@frekingandbetz.com*
*jallison@frekingandbetz.com*

19

## CERTIFICATE OF SERVICE

I hereby certify that on January 21, 2011, a copy of the foregoing was filed electronically. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system and copies will be mailed via U.S. mail, e-mail and/or facsimile to those parties who are not served via the Court's electronic filing system.  Parties may access this filing through the Court's System.

/s/ Jon B. Allison